Estate of Louis Schumacher, Gillum H. Doolittle, Executor v. Commissioner.
Estate of Schumacher v. Commissioner
Docket No. 109988.
United States Tax Court
1943 Tax Ct. Memo LEXIS 47; 2 T.C.M. (CCH) 1018; T.C.M. (RIA) 43492; November 29, 1943
*47 Gillum H. Doolittle, pro se. Lawrence R. Bloomenthal, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves a deficiency in estate tax determined by the Commissioner in the amount of $7,644.99. Two issues are presented for decision. The first is whether certain transfers made by decedent in his lifetime were made in contemplation of death; the second is whether the Commissioner erred in disallowing a deduction of the alleged present value of certain gifts in remainder passing under decedent's will to charitable institutions. A third issue raised by the pleadings has been expressly abandoned by the petitioner. The parties have filed a stipulation of facts which we adopt and incorporate herein by reference. Such parts thereof as are necessary to an understanding of the issues are incorporated in our findings of fact made also from evidence submitted at the hearing. Findings of Fact The petitioner is the executor of the estate of Louis Schumacher, deceased, having been appointed by the Probate Court of Summit County, Ohio, on December 26, 1939. Louis Schumacher died a resident of Akron, Ohio, on December 19, 1939, at the *48 age of 87 years. A Federal estate tax return for the decedeet's estate was filed with the collector for the eighteenth district of Ohio on March 19, 1941. During the earlier years of his life the decedent was connected with Schumacher Milling Co., which had been founded by his father. The business was sold 25 or 30 years prior to decedent's death. He then retired, and did not thereafter actively engage in any business. In addition to a residence property occupied by himself and his wife, he owned a parcel of real estate in the City of Akron, on which his tenant under a 99-year lease had erected a hotel building. Rents from that property provided him with his principal source of income, after his retirement. The lease had been executed in 1913 or 1914 at an annual rental beginning at $9,000, and increasing progressively over the term to $14,000. By 1930 the agreed rate had reached $11,000. However, during the years of the economic depression the decedent had permitted substantial reductions, so that in 1939 the lease returned only $8,400, exclusive of taxes paid by him. Schumacher and his wife had never had children. After his retirement from business they traveled extensively, both *49 in Europe and in America, until the outbreak of the first World War, and thereafter only in this country. It then became their custom to spend part of almost every winter at Atlantic City, New Jersey, or at other vacation resorts in Florida or California. During the last two or three years of the decedent's life, however, the health of his wife began to fail. On that account, they were no longer able to travel or take vacation trips as they had in the past. From time to time during his life the decedent had accumulated personal property worth from $10,000 to $25,000, but it had not been his custom or practice to retain these savings to any great extent. With the exception of household furniture and jewelry, the only personal property owned by him at the time of his death was about $2,000 which he had on deposits. In addition to money spent in traveling, and for the support of himself and his wife, he had made frequent and substantial gifts to his own and his wife's relatives prior to 1929. He gave his brother, F. A. Schumacher, birthday gifts of from $300 to $1,000, and gave his brother's children gifts in amounts ranging from $25 to $200, sometimes on the occasion of their birthdays, *50 anniversaries or weddings, and sometimes without regard to any such special occasions. He made regular Christmas gifts to the five children of his sister-in-law, Antonia Grantham, in amounts ranging from $100 to $1,000 for division among all of them. During the years of the depression, from 1929 until his death, he made very few of such gifts. He did, however, send $100 a month for the support of Emma Curtis, a sister of his wife, and gave $50 a month to Ada Schumacher toward the support of an adopted child. During October and November 1939, having accumulated about $25,000, he made gifts totaling $22,800, to relatives and in amounts as follows: Donee
Relationship
Amount
October 26, 1939
James Grantham
Nephew of Wife
$1,500.00
October 26, 1939
Harold Grantham
Nephew of Wife
1,500.00
October 26, 1939
Theodore Bent
Niece of Wife
1,500.00
October 26, 1939
Marjorie Loveland
Niece of Wife
1,000.00
October 26, 1939
Mary Pehrson
Niece of Wife
1,500.00
October 26, 1939
Ade' Schumacher
Nephew of decedent
1,500.00
October 26, 1939
Hilda McBride
Niece of decedent
1,500.00
November 1, 1939
J. M. Grantham
Brother-in-law
1,000.00
November 1, 1939
Esther Grantham
Niece of decedent
1,500.00
November 1, 1939
Doralou Sanger
Niece of decedent
1,000.00
November 1, 1939
Liana McMillan
Niece of decedent
1,500.00
November 1, 1939
Will Habicht
Cousin once removed
1,000.00
November 1, 1939
Lawrence Mayhew
Nephew of Wife
200.00
November 1, 1939
Louis Mayhew
Nephew of Wife
200.00
November 1, 1939
F. W. Schumacher
Brother-in-law
3,900.00
November 1, 1939
Ralph Schumacher
Nephew of Wife
1,000.00
November 1, 1939
William Alfred
Nephew of Wife
1,000.00
Schumacher
November 23, 1939
Martha Schumacher
Wife of decedent's cousin once
removed
500.00
*51 Shortly after making the gifts, the decedent, in speaking of them to an intimate friend, said that he and his wife would no longer be able to use the money for traveling, on account of her health, and that the donees could probably use the money better then than after he had passed away. He enclosed a note with the gift to one of the recipients to the effect that he had accumulated some money which he felt was a surplus, so far as he and his wife were concerned, and that he was going to send out some little Thanksgiving presents. He did not discuss the making of the gifts with his attorney prior to the time they were made, but did tell him of them subsequently, saying that he had accumulated some money which he did not need; that on account of Mrs. Schumacher's condition they could do no more traveling; that he felt that improved business conditions would shortly enable him to bring the annual rental of his business property back to around $10,000; that some of the donees needed the money; that all of them could use it; that it would do them more good then than after he was gone; and that he had never done anything out of which he had derived so much satisfaction because of the splendid *52 letters he had received from the people to whom he had made the gifts. Schumacher was in very good health for a man of his age. He was mentally alert and took active interest in current affairs. He took walks out of doors, and went up and down stairs with no cane or other artificial aid. Prior to his last illness he had not been under physician's care for other than minor and infrequent bronchial attacks and occasional stomach upsets. The last such bronchial attack occurred in 1937; the last gastric disturbance on July 26, 1938. None of his prior minor illnesses had any connection with that resulting in his death. On several occasions during the last year of his life he remarked to a friend, and to the physician who attended him and his wife, that he expected to live for a number of years, or that he thought he would reach the age of 90. He made one of such remarks at some time subsequent to the making of the gifts in question. On December 12, 1939, he contracted broncho-pnuemonia. On December 16, his physician noticed symptoms of acute myocarditis, a weakening of the heart muscles brought on by infection, and on December 19, petitioner died. The death certificate states the principal *53 and contributory causes of death to have been acute myocarditis and broncho-pneumonia, respectively. The decedent executed his will on November 30, 1937. Except for certain personal property left to his wife, Dora Schumacher, he devised his entire estate to trustees, to pay the income to his wife during her life. The trustees are granted certain powers, one of which is as follows: * * * and if for any reason the comfort or convenience of my wife shall require it, the trustees shall have full power and authority to use so much of the principal of the trust fund as may be necessary to provide for her every comfort and convenience. The provisions for disposition of the remainder, after the death of decedent's wife, are in substance as follows: A 1/10 share of the income to be paid to each of the five children of F. A. Schumacher, testator's deceased brother, namely, Hilda McBride, Mary Schumacher Pehrson, Liana Schumacher MacMillan, Dora Schumacher Sanger, and Ada Schumacher; a 1/12 share thereof to be paid to each of six of his wife's brothers and sisters, namely, Otto C. Schumacher, Theodore Schumacher, Frank W. Schumacher, Antonia Grantham, Emma S. Curtis, and Helen Mayhew. Upon *54 the death of any of the children of F. A. Schumacher, a one-tenth share of trust corpus passes to the then surviving children of the child so dying, or, if no children then survive to certain hospitals of the City of Akron. Upon the deaths of the brothers and sisters of decedent's wife, the following several dispositions of 1/12 shares of corpus are to be made: Otto C. Schumacher, $5,000 thereof to his son if his son survive; Frank W. Schumacher, $5,000 thereof to each or either of his sons who then survive; Antonia Grantham, an entire 1/12 share to her five children, or those who then survive, in equal shares; Emma S. Curtis, an entire share to certain hospitals of the City of Akron; Helen Mayhew, $3,000 thereof to each or either of her sons who then survive, and the balance thereof to certain hospitals of the City of Akron; Theodore Schumacher, $5,000 thereof to his wife Ada, if she survive, and the balance, or whole thereof if she be dead, to certain hospitals of the City of Akron. The undisposed of portions of the shares of Otto C. and Frank W. Schumacher are directed to be paid to the surviving children of Antonia Grantham. The hospitals entitled to the several gifts in remainder *55 were all charitable institutions, and all were in existence on the date of the testator's death. All five children of F. A. Schumacher survived the testator. A codicil to the will executed November 22, 1939, revoked the appointment of one of the testator's executors and trustees, but made no change in the will with regard to the disposition of his estate. Most of the beneficiaries under the decedent's will were also recipients of gifts made by him in October and November 1939. The amounts of the several gifts, however, were not proportionate to the shares which the donees are ultimately to receive under the testamentary trust, nor were gifts made to all of the persons named as beneficiaries of the trust. The principal factor motivating the decedent in making the gifts was his desire to help financially those of his own and his wife's relatives who were in need of money, and incidentally to enable others of them to enjoy its use presently without having to wait until after his death. Their expressions of appreciation of his benevolence were a source of gratification to him. The gifts were not made in contemplation of death. Dora Schumacher was 88 years old when her husband died. During *56 the two-year period following his death, the cost of supporting and caring for her, and of maintaining the residence property which she continued to occupy was about $8,400. Trust income over the same period slightly exceeded $15,000. On the estate tax return, the petitioner elected to have gross estate valued as of the optional valuation date, and reported its value as $159,737.01 exclusive of the gifts of $22,800. He claimed deductions aggregating $32,419.20, including a deduction of $15,527.10 as the then present value of the testamentary gifts to charitable institutions. The following statement was made on Schedule N of the return to explain the manner of computation of that value: From the net estate we have deducted the value of the widow's rights during her lifetime. We have then taken one-twelfth of that amount. The widow was 88 at the time of the death of the decedent. At that time Theodore Schumacher had already died. From one-twelfth we have deducted $5000.00 payable to Ada Schumacher his widow and thus ascertained the remainder due the hospitals. ($5911.12) Emma S. Curtis at that time was 74. We have computed the present value of her right to income on one-twelfth *57 for the remainder of her life, deducted that from the value of one/twelfth and considered the remainder as due the hospitals. ($7995.67) Helen Mayhew at that time was 72 years of age. We have deducted the present value of her right to income for life, have then deducted $6000.00 to which her two sons are entitled at her death, and treated the remainder as due the hospitals. ($1620.31) The respondent determined that the gifts made in October and November 1939 had been made in contemplation of death, and accordingly added $22,800 to reported net estate. He disallowed the deduction claimed in respect of the charitable gifts on the ground that the possibility of invasion of corpus for the benefit of the decedent's widow rendered their value unascertainable. Other adjustments to net estate are not in issue. Opinion We consider first the question whether the amount of the gifts made in October and November 1939 should be included in the decedent's gross estate under section 811 (c) of the Internal Revenue Code, the pertinent provisions of which are set forth in the margin. [1] The petitioner concedes that the gifts constituted a material part of the decedent's wealth, and that, having *58 been made within two years prior to his death, they are to be deemed to have been made in contemplation of death unless the contrary be shown. Our inquiry with respect to this issue is limited, therefore, to whether the evidence is sufficient to overcome the statutory presumption. *59 Louis Schumacher, although advanced in years, enjoyed good health at the time he made the gifts, and continued to do so up until a week or ten days before his death. He had no chronic ailments; it was more than a year prior to death since he had suffered any illness requiring the care of his doctor, and then only for a stomach upset in no way connected with his last illness. He was physically active and mentally keen. Moreover, he was aware of the fact that his health was good, and he believed that he would live for a number of years. An elderly man is doubtless more likely to be aware of death than a younger man, but advanced age alone does not furnish a sufficient basis for the conclusion that a transfer was made in contemplation of death, even in a case where death follows shortly after. United States v. Wells, 283 U.S. 102. See also Rochester H. Rogers, Executor, 21 B.T.A. 1124, in which the Board held a transfer not in contemplation of death where the transferor was 91 years of age, and died four months after the making of the gifts. Aside from the fact of his advanced age, there was nothing about the physical condition *60 of the decedent in this case which would furnish any basis for the conclusion that the thought of death possessed his mind to such an extent as to have been a compelling motive for the gifts. We must turn, therefore, to other circumstances casting light upon the problem. The decedent's income was more than sufficient for the support of himself and his wife. It was not his practice to accumulate or invest the excess. Until a few years prior to his death, he made frequent and substantial gifts of money to his own and his wife's relatives. In the words of one of the witnesses, "he was very generous and generous very often." What he did not use for living expenses or give away, he spent to a considerable extent in traveling for pleasure. When the general business depression of 1929 and the early 1930's necessitated the reduction of the rent from his business property, and thus lowered his income, he made only smaller and less frequent gifts. By the time his income had begun to approach its former levels, his wife's health had become such that they could no longer travel as they had in the past. As a result, he had an accumulation of about $25,000 which he considered a "surplus." Some *61 of those to whom he had formerly made gifts were in need; he felt that others could use money to better advantage then than after his death. We need not decide whether the frequency and the relative amounts of the gifts made at prior times during his life were sufficient to warrant the conclusion that those with which we are here concerned were merely the last in a series of gifts made in pursuance of a long-established policy. The evidence does establish, however, that the decedent had always been a generous man; that he had found it possible to give away money to persons in whose well-being he was interested, and in amounts that were, for a man of his income, by no means negligible. For a person of such a nature, to whom generosity was a source of gratification, the making of the gifts in October and November 1939 was not such an unusual step to take as to bespeak an intention on his part to set his affairs in order and to make final arrangement of his property. Cf. B. Paul Mossman, Executor, 32 B.T.A. 596. The respondent argues that the fact that almost all of the persons benefited by the gifts were also beneficiaries of the testamentary trust is *62 a clear indication that the gifts were in the nature of, and in pursuance of, a general plan of testamentary disposition. We think that no such inference is permissible where, as here, the dominant motives were to assist those donees who were in financial need and to give to the others the benefit of the present use of the money. Nor does the fact that the decedent asserted that some of those to whom gifts were made could use the money to better advantage then than after his death require a different conclusion. In Safford v. United States, 66 Ct. Cl. 242, plaintiffs' testatrix was advised by her attorney that because of unsettled conditions in Mexico, where much of her property was located, there was a possibility that her estate might not be sufficient for the payment of legacies for which she had provided by will. He recommended the making of the gifts there in issue. In following his advice, the decedent stated to two of the beneficiaries that she wished to have them paid "'at the present time,' instead of waiting for her death." The gifts were held not to have been made in contemplation of death, the court saying: * * * While in one sense death *63 was considered when the testator concluded that she wanted the beneficiaries to have the property at once instead of at her death in the indefinite future, she was not actuated by a consideration of death nor did her motive in making the transfer arise therefrom. The controlling influence seems to have been the advice of her attorney with reference to the condition of her estate and a desire that the donees should immediately receive the benefits of her bounty without being obliged to wait for her death. In Llewellyn v. United States, 40 Fed. (2d) 555, decedent made gifts to some of his children who were in need of financial assistance, to others who could use it to great advantage, and to others because of his belief that his failure to treat all equally might cause hard feelings later. It was held that the gifts were not made in contemplation of death, even if by the word "later" the decedent was referring to his own death. Schumacher's expression concerning his motives was, in substance, but very little different from a statement that he wished to give the donees the immediate enjoyment of property for which he had no use, in order that he might *64 witness its enjoyment by them during his lifetime. Such expressions have been held to indicate motives associated with life rather than death. See, e.g., B. Paul Mossman, Executor, supra, and Daniel J. Gallery et al., Administrators, 38 B.T.A. 1211. Cf. United States v. Wells, supra.The similarity of the instant case to those cited is further indicated by the fact that the donees' expressions of appreciation of his generosity were of great satisfaction to the decedent. In the light of the further facts that the amounts of the gifts were not in proportion to the shares of the beneficiaries under the will (in some instances they were markedly disproportionate), that some of the gifts were to persons not benefited by the will, that no gifts at all were made to other persons entitled to substantial shares of the trust created by the will, and that even the larger of the gifts were in amounts that the decedent might reasonably expect would be consumed during his lifetime, we find it difficult to conclude that there was any unified plan of testamentary disposition. The dominant motives were *65 motives associated with life, not with death, and, as we stated in our findings of fact, the gifts were not made in contemplation of death. Our decision on this issue is for the petitioner. There remains the question whether the estate is entitled to a deduction from gross estate for the value of the testamentary gifts to the hospitals, all of which, according to the stipulation of facts, were charitable institutions in existence on the date of the testator's death. We assume from the fact that it is stipulated that the hospitals benefited by the will were "charitable institutions," and the fact that no point to the contrary is raised, that all were within the class of corporations defined in section 812 (d) of the Internal Revenue Code, [2] since the respondent questions the right to the deduction only on the ground that the value of the charitable remainders could not be computed with any reasonable degree of certainty at the time of the decedent's death. His contention is that the power granted to the testamentary trustees to use so much of trust corpus as may be necessary to provide for the widow's "every comfort and convenience" renders such computation impossible. Petitioner *66 argues in effect that the possibility of invasion is so extremely remote under the circumstances of this case that it may fairly be disregarded as affecting the value of the remainder, under the authority of such cases as Ithacatrust Co. v. United States, 279 U.S. 151. *67 In our opinion, the Supreme Court very recently in Merchants National Bank of Boston v. Commissioner, 320 U.S. 256, rendered a decision which controls us under the facts here involved. In that case the decedent's will set up a testamentary trust, but permitted discretionary invasion by the trustee of the corpus when deemed wise and proper "for the comfort, support, maintenance and/or happiness of my said wife," the trustee to exercise discretion with liberality to the wife and to consider her welfare, comfort and happiness prior to claims of residuary beneficiaries, which included certain charities. It was held that the introduction of the element of the widow's happiness and the instruction to the trustee to exercise discretion with liberality and to make her wishes prior to the claims of residuary beneficiaries, brought into the calculation of the bequest to charity elements of speculation too large to be overcome, and the disallowance of deduction on the ground of charitable bequest, was approved for both estate tax and income tax purposes. In the instant case, the devises to charity were subject to a provision that the trustees should "if for any *68 reason the comfort or convenience of my wife shall require it" have full power and authority "to use so much of the trust principal as may be necessary to provide for her every comfort and convenience." It is therefore apparent that, as the Supreme Court says in the Merchants National Bank of Boston case: Under this will the extent to which the principal might be used was not restricted by a fixed standard based on the widow's prior way of life. * * * Although the will here being considered did not mention the wife's happiness, which the Supreme Court noted in its opinion, nevertheless, we see herein that the trustees might invade principal, if for any reason the comfort or convenience of the wife should require it, to the extent necessary to provide for her every comfort and convenience. Such language encompasses no less than "comfort, support, maintenance and/or happiness" in the will construed as above by the Supreme Court. In our opinion, the provisions of the will presently being examined pose a question as to the calculability of the value of the charitable devise no less difficult than in the cited case. The broad intent of the testator to limit to no narrow *69 nor definite standard is plain. Furnished by the will with no yardstick based upon the widow's customary mode of life, we find no gauge for the comfort or convenience of the wife, and the interpolation of the elements "if for any reason" and "every" as adjectival expressions modifying "comfort and convenience," patently add to the difficulty of the calculation involved in severing the charitable bequest from the provision for the wife. Indeed, every comfort and convenience may well be considered synonymous with happiness. It is our opinion that no real distinction can be made between the testamentary provisions here confronting us and those involved in the Merchants National Bank of Boston case. Reference is also made to the discussion of the cases on this subject in Gammons v. Hassett, 121 Fed. (2d) 229; certiorari denied, 314 U.S. 673; also Humes v. United States, 276 U.S. 487; all to the same general effect as in the Merchants National Bank of Boston case. We conclude and hold, therefore, that the deduction for charitable gifts was properly denied. Decision will be entered *70 under Rule 50. Footnotes
1. SEC. 811. GROSS ESTATE. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States - * * * * *
(c) Transfers in Contemplation of, or Taking Effect at Death. - To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of * * * death, * * *; except in case of a bona fide sale for an adequate and full consideration in money or money's worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this subchapter.↩
2. SEC. 812. NET ESTATE. For the purpose of the tax the value of the net estate shall be determined in the case of a citizen or resident of the United States by deducting from the value of the gross estate - * * * * *
(d) Transfers For Public, Charitable, and Religious Uses. - The amount of all bequests, legacies, devises, or transfers, to or for the use of the United States, any State, Territory, any political subdivision thereof, or the District of Columbia, for exclusively public purposes, or to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private stockholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, or to a trustee or trustees, or a fraternal society, order, or association operating under the lodge system, but only if such contributions or gifts are to be used by such trustee or trustees, or by such fraternal society, order, or association, exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals. * * *↩